Our next case on the call at the docket is agenda number 8, case number 112064, Dorothy Pielet v. James Pielet. Counsel for the appellant. Matthew O'Hara May it please the court, my name is Matthew O'Hara and I represent the defendant PBS1. The issue before the court in this case is a question of statutory construction. The statute at issue, section 12.80 of the Business Corporation Act addresses what rights, claims and liabilities survive the dissolution of a corporation and if so, for how long. The rule of law that we ask the court to adopt in this case is that the survival statute in the Business Corporation Act protects only those claims that have accrued and only those rights that are fixed and ascertainable at the time of a corporation's dissolution. The rule of law that we urge the court to adopt here has the virtue of continuing to provide certainty to practitioners who are advising corporations and the parties that deal with corporations. Here, if we look at the record in our case, we see that the problem is not the statute or our reading of the statute as the plaintiff contends, but rather it's the contract that plaintiff's husband, Arthur Pielet, negotiated back in 1986 that prevents him from bringing his claim against PBS1. If we look at the record, you can see a very clear example that tells you if you are bargaining a long-term agreement with a corporation, you have to take into effect the possibility that it may dissolve, it may go bankrupt, it may cease to exist. And here, if we compare Arthur Pielet's contract with a contract that one of his sons, Robert Pielet, had with the very same corporation, we can see the difference. Robert Pielet, like Arthur Pielet, sold his interest in Pielet, Inc. He did so in early 1988, and he obtained a consulting agreement as well as consideration for the sale of his stock in the company. What he had, though, was a contract with installment payments over a fixed period, a fixed term of years, and he also required the corporation to post collateral as security for the performance of the corporation's obligation. In contrast, Arthur Pielet, the contracted issue in this case, did not have a fixed term of years for his consulting agreement, did not have a fixed amount, and there was no collateral that was required to secure the performance of the corporation's obligations. There was nothing like an annuity. And so what we have then is a situation that illustrates that Robert Pielet's rights were protected under the survival statute, but Arthur Pielet's were not. Uniformly, the cases construing Section 12.80 agree on two broad principles. The first is that the public policy behind the statute is to set a fixed point in time when the corporation ceases to exist and the transaction of business by and with that corporation terminates. Secondly, the cases uniformly interpret the language at issue in this case, which is any right or claim existing or any liability incurred, refer to tangible, fixed, and ascertainable interests, not contingent ones. The statutory language is what animates the public policy behind the statute. It creates certainty for the dissolving corporation and its shareholders, and it creates certainty for creditors and other counterparties of the corporation that's dissolving. It's important to note that the statute works both in favor of a corporation and against a corporation. Are you saying it's as simple as avoiding this contractual obligation would be to simply dissolve the corporation if it's a contract such as Arthur had, which simply provided for consultation fees for the rest of his life without any fixed amount or fixed installments or collaterals? Well, I would say that when a counterparty with a corporation enters into a contract, it is that simple, Your Honor, yes. If the party that has the contract with the corporation has a contract that provides future installment payments with conditions precedent to payment on a periodic basis, that claim is not fixed and ascertainable, and under the laws that stood in Illinois for a very long time, you would know that that would be a barrier to your claim should the corporation dissolve. And therefore, it would be in your interest to negotiate a contract that had a fixed term or a fixed amount or to otherwise require security for the performance of the corporation's obligations. As I was saying, the statute has a very balanced framework. So we know, for example, if you're a creditor of a corporation, you understand you have to have an accrued cause of action or possess a fixed and ascertainable right, or else your claim is barred if the corporation should dissolve. By the same token, claims by a corporation are also barred if they are not accrued before the time of dissolution, and we see that in the Henderson-Smith case decided by the appellate court as well as the Seventh Circuit opinions construing our survival statute in the Sharif and Canadian Ace cases. And under your interpretation of accrued, then, would that mean that only if the corporation had failed to pay an annual installment and it was in default that that would be an accrued claim? Well, certainly, Your Honor, in this case, if at the time of PBS-1's dissolution there was an amount due to Arthur Pilot that had not been paid, he would have had an accrued claim. He would have had an accrued cause of action. Here, of course, when PBS-1 dissolved, Mr. Pilot did not have an accrued claim. The contract had not been breached, and Mr. Pilot had not been damaged. I see the light's already on, but I do have a question. I know we're talking about Section 12.80, but do we need to look at 12.75 of the Business Corporation Act, known claims against dissolved corporations? Does that factor into our analysis at all? Not really, Your Honor, and I think if the court were to consider that, it would support our view, our construction of 12.80, and that's because 12.75 addresses known claims. And 12.80 does not simply address claims. It addresses existing claims. And so there's a procedure in 12.75 of the BCA that says, here's what happens with known claims. And then in 12.80, the requirement is that the claim be existing. And a claim might exist without being known. So in a sense, 12.80 is a more, a broader framework for the preservation of claims. And we know this in, say, in the products liability context, where a corporation may be dissolving, and a person may have already been injured using equipment that was manufactured by that corporation. And so that person, that tort claimant, may already have an accrued claim, but it's not known to the corporation because it hasn't been filed yet, the statute of limitations hasn't run. Could there be a known claim without there being an accrued claim? I don't believe there could be a known claim without there being an accrued claim. There could be a known right without an accrued claim, but it would have to be a fixed and ascertainable right. Briefly, Your Honors, I'll mention four things that tell us that our reading of the statute is consistent with the legislature's intent. We know that the cases have construed the statute this way for many years, yet the legislature has not seen fit to change the key language at issue here since 1941, and really not in any substantive way since 1871. We know that the Model Business Corporation Act used to follow our statute, and in 1984, they abandoned that path for a known and unknown claims framework, while our legislature continued with the existing language. We know that other states have expressly preserved contingent claims, such as Delaware, Pennsylvania, and Minnesota. And we know that our reading of the statute is consistent with the dictionary definition of the word existing, as contracting the word existing. And we know that existing rights and contingent rights are very different. We know that in other contexts, such as the law concerning who is a creditor, tax law, and property law. With that, Your Honors, I would ask that you reverse the judgment of the appellate court and enter judgment in favor of PBS 1. Thank you. May it please the Court, I'm Daniel Grabaschuk, here this morning on behalf of National Material, L.P. and National Material Holding, Inc., the defendants, and with me this morning is my partner, Manny Plasencia. The opinions of the appellate court in this matter are in error for two reasons. One, it misapplied the plain and unambiguous language of the contract. And secondly, in count 10 regarding corporate success or liability, it misread and misapplied again the directions of this court in Vernon v. Schuster. Under count 9, the contract obligation, the purchase of a limited partnership interest is no different than the purchase of a share of stock. When you purchase a share of stock, you know with certainty that you are gaining just the equity interest of the corporation, not the obligations of the corporation, certainly not the obligations of the party that owned that stock before you. By the same token, a limited partnership interest is not a vehicle of transfer, whereby an obligation from one party moves to another by that limited partnership interest. A limited partnership interest is a specific and defined right with specific and defined limited liability. Now, in this instance, the court went beyond the plain meaning of the document and held that it was reasonable to conclude that a liability of PBS-1 somehow became an asset, attached to an asset of PBS-1, that it subsequently sold to National Material for $5.5 million. Can I ask you a couple of questions? I want to make sure I have my facts right, number one, and then if you could just comment before you get into what you're getting into, how if at all these facts would apply to the situation before us. Was National Material just a paper restructuring of PBS-1? Not specifically. In one instance, it was because the asset that PBS-1 owned was sold to National Material, but PBS-1 always remained a viable corporation for another three and a half years until it was administratively dissolved. Now, granted, it wasn't doing anything during that period, but it was essentially a holding company that could have been used at any time for similar investments if parties who control it would have chosen to do so. Okay. The pilot LP limited partnership agreement was amended to name National Material as PBS-1's successor, right?  All right. And the consulting agreement was an obligation of pilot LP, right? Yes, it was. Okay. And is it also a fact that National Material continued to pay Arthur according to the consulting agreement? No. That is not true. Pilot LP paid for the consulting agreement at all times. Okay. All right. So now you can go into your argument, but at least those are the facts. Well, what lies at the heart of this issue is the specific wording of the 1991 Assignment, Assumption, and Consent Agreement. Clearly, what was assigned was 100 percent of a limited partnership interest based upon the pilot LP partnership agreement. What was assumed was 100 percent of a limited partnership interest, again, based upon the partnership agreement. The consent on that document was given by the general partner pursuant to the limited partnership agreement, specifically Article 16, dealing with the transfer of a limited partnership interest. Nothing else was accomplished on that document. No other asset was transferred, no other obligation was transferred, just the limited partnership interest. So would the consulting agreement have to have been specifically listed in order to be covered? Well, the only obligation that attaches to a limited partnership interest is the obligations either set forth by statute or set forth in the limited partnership agreement. So, yes, a limited partnership interest does carry with it obligations. That's it, and that's what was dealt with here in this document. If anything else was going to be transferred, it needed to be specifically enumerated. If, in fact, you were to take the argument of the plaintiff in this case that this consulting agreement somehow became part of this word obligation, you would also have to assume that the millions of dollars of other obligations that the plaintiff also argues that PBS 1 assumed during the original transaction somehow transferred. That goes way beyond the intent of this document. It certainly is not covered by the use of the word obligation. Here, obligation is specifically the obligation of a limited partner pursuant to statute or pursuant to the limited partnership agreement. There's simply no other way to read this document, and based upon this clear, nonambiguous language, we believe that national material is entitled to judgment as a matter of law on Count 9. The next issue, though, on corporate success or liability, the appellate court essentially erred when it determined that national material was the mere continuation of PBS 1. Doing so, the court held, essentially, that per se success or liability occurs when there are common officers and common directors. It held that the specific purpose was immaterial, and whether or not adequate consideration was paid was not relevant. Now, this court addressed the issue of success or liability in Vernon v. Schuster, and at that time this court determined that there was not the commonality of ownership so that they did not need to address the exceptions to the rule. There are exceptions, though. The general rule, obviously, is that someone who purchases the assets of a corporation is not the corporate legal successor of that entity. The exceptions deal with other issues, and in this instance, the one exception the court dealt with was the mere continuation exception. Now, in Vernon, this court looked to a Maryland case, Baltimore Luggage, to give the rationale behind the mere continuation exception, and there it was determined that you look to the transaction to see if the specific reason for the transaction was to place assets out of the reach of creditors. Now, in this instance, it's clear that national material paid $5.5 million for the limited partnership interest, and the record is clear that that was deemed to be reasonable equivalent compensation. It is clear from the record that the transaction took place for specific legitimate business purposes. There is no proof in the record that assets were transferred to hide them from creditors. The uncontradicted evidence in the record shows that adequate consideration was paid. It was done for a business purpose. If the appellate court's ruling is allowed to stand on challenge, corporate successor liability will attach merely upon a showing of common officers, common owners, and the specific purpose, whether or not consideration was paid or any other relevant factors will no longer be part of the equation, and then Illinois will stand alone on this issue. Now, we believe that national material and national material holding are entitled to judgment on this matter, and if, in fact, the court does not reach that conclusion today, we would ask that it be remanded to the court for trial on those specific issues. Is that your argument? That's my argument, sir. Thank you very much. Thank you. Counsel for the appellee. I agree with counsel for PBS1 that this does present a case of straightforward statutory interpretation. The question of statutory interpretation is the meaning of the phrase, any right or claim existing or liability incurred. I also agree that the statute has largely remained unchanged since 1871, and I agree that there's a balance that's supposed to be struck. That balance is a balance between the rights of creditors to be able to go after a corporation for obligations that it did assume, but there may not have been a breach until afterwards, and the right of corporations to some certainty when they do dissolve. We have a fundamental difference of opinion, the appellants and the appellee,  and we have a balance. According to PBS1, the statute has and has always been something that excluded anything that was contingent. That's absolutely not what the Evans decision says. Very clear on page 112, 113 of that decision, that the court said when was the liability incurred, and mind you, the phrase right or claim existing was what was added later. Liability incurred is what's been in the statute from the beginning. What did the court say? The liability in this case under a surety bond was created prior to the appointment of the receiver on the execution and delivery of the bond. Here, same thing. When PBS1 assumed that obligation, it incurred the liability. When was the breach? The cause of action accrued on that liability when there was a breach of the bond, and the court says at the beginning that breach didn't occur until after dissolution, and what happens, there's a period of time there, two years, here five years to proceed. This is not a situation in which the court needs to adopt any new rule. It's a situation in which the court should enforce an existing rule. What do we do with the language, Mr. Lloyd, the language that, the word existing? Well, the word existing, Your Honor, modifies claim or right. The liability incurred is, it actually does not actually modify liability incurred. The defendants have never argued that interpretation. We're not even then to take into account under that interpretation. PBS1 was dissolved in 94. Correct. And plaintiff continued to receive payments until 1998. That is correct. I'm sorry, Your Honor, just a footnote. Continued to receive payments from, we would say, one of multiple entities who are obligated to provide the payment. All right. And so plaintiff, could plaintiff have sued PBS1 in 1994, 95, 96, 97, or most of 98? I doubt it, because there probably would not have been a right cause of action if there had been some evidence that PBS1 had dissolved intending to evade that liability. Perhaps they could have brought a suit for declaratory judgment and said, while we are receiving existing payments, we have a concern that one of the obligors is going to be gone and we better get a declaration, because there's no dispute in this case that if they dissolved a year later, we wouldn't have a right to go against them. Right? I mean, we sued. There's no dispute that we sued within the right period of time. So this is not a situation on Mr. O'Hara's certainty point. They would have had certainty if they dissolved a year later. So your fundamental disagreement is that you don't agree, obviously, with the fact that you had no claim until 1998, five years after PBS1 was dissolved. No, I want to be careful with that, Your Honor. Our view is that we had both a right and there was an incurred liability prior to 1998, prior to disillusion, and that's under the Evans decision. I think we would be hard-pressed to argue, given the tort cases, that there was actually an existing claim. But the statute has three different provisions. It has a right, it has a claim, or it has a liability incurred. And we agree with the Second District. Aren't we writing the words for any right or claim existing, comma? Aren't we writing those out of the statute? Oh, absolutely not, Your Honor. I think that if you go with the defendant's interpretation, you're writing liability incurred out of the statute. Because in Evans, it's on all fours. In Evans, the surety bond was incurred, it was breached afterwards, they sued afterwards, and the contention before this court was, you're done. Because the corporation there, it was a receivership, but it was the parallel to having a dissolved corporation. So if Your Honor says, you're not writing right or claim out of the statute, you'd be writing liability incurred out of the statute. Because they were essentially a surety. They were essentially a guarantor on this. They're guaranteed didn't become due because they were somebody who was also paying. Okay. Give it to me one more time, then, what your interpretation of for any right or claim existing. Any right or claim existing, there was a right, a contingent right to payment from PBS-1 prior to dissolution. There was a liability that had been incurred by PBS-1 prior to dissolution. I guess that's where we have a difficulty. Contingent right existing that is not actionable at the time that that right is existing. That's basically what you're saying, isn't it? Well, I'm saying for a liability incurred, it can absolutely be contingent. Because as this Court said in Evans, and I'm quoting, Your Honor, from page 113 of the Court's opinion, we know of no definition of the word liability either given in the dictionaries or as used in the common speech of men which restricts it to such as are absolute or excludes the idea of contingency. In fact, it's more frequently used in the latter sense than the former. And in that instance, they really are making the same argument. I mean, we have a fundamental difference of opinion that's there in the reply brief. They say we're quoting it out of context. Well, I don't think the quote is unclear. I think that it gives meaning to the word liability incurred. It gives meaning to the notion that if you have something that's like a guarantee or a surety, that obligation may not come into existence. And as Mr. O'Hara said in response to Justice Carminer's question, yes, that is their view. Their view is basically caveat emptor if you're a contracting party with a corporation and there's any kind of contingency. But that's not ever been the law in Illinois. And that's why the Second District recognized that they were reading out of the statute any right and liability incurred. Yes? I think I heard you say that at the time the corporation was dissolved, we would almost have to look at every corporation to see whether or not they dissolved for the purposes of avoiding any kind of an obligation. Is that what you're trying to do? Absolutely not, Your Honor. Absolutely not. I think the statute as its purpose protects the rights of creditors and balances those rights against the right of certainty. But there's no requirement in the statute to show that their purpose of dissolving was to evade a responsibility. The point is that the statute provides that if there is a liability that has been incurred, there is five years to go after the corporation on that liability. And the corporation in this instance, PBS1, according to the record, it's right there in the agreement that they had assumed the consulting agreement. They knew that this was an obligation. And they also knew, I mean, we do have a common shareholder and common entity that was providing this. Mr. Pang was in charge of Midwest Metallics and was paying and put that company into bankruptcy. I mean, this is not a situation where there's a lot of uncertainty or arm's length transactions. But in any event, no, you don't. A corporation can dissolve in a reasonable, reasoned, logical, administrative fashion while taking into account the fact that it has a liability that may have a long tail. What about the idea of the specific liability has to be articulated for a limited partnership? They have no authority to suggest that that's actually the case. There are many situations where there are claims that may be contingent. They may have conditions precedent in them. In this instance, what they're doing is they're actually reading in an exception for claims that have conditions precedent. What I would agree with in response to Justice Thomas's comment, I mean, it's not the case that if there is an accident, for example, in a product liability case that happens after a corporation dissolves. You know, there's land, the corporation's dissolved, and somebody's injured on the land. I mean, it's pretty clear. The Blankenship case makes that pretty clear, that that tort claim, you know, the corporation has been dissolved, and unless it's administratively reinstated, it's done. That's not the same thing, though, as ceasing payments under an installment contract where performance was done. And in this instance, I mean, the notion that, you know, parsing the two pilots. I mean, Mr. Pilot was under a consulting agreement. He actually went to work. That's a different agreement than a buyout. So, I mean, the notion that buyouts are protected because you protected yourself is actually begging the question. I mean, you just need a clear rule that says if a corporation, if you impose the rule that we're asking for here, that the Second District imposed, you're not creating havoc and uncertainty with corporations. They'll just make sure they look at their list of liabilities. They'll make sure that they have purchased insurance and reserve for those kind of contingencies. Well, we say contingent liabilities. There wasn't any breach at the time of these contingent liabilities, was there? Not in Evans and not here. Not by PBS-1. There was certainly a breach after disillusion by both Midwest Metallics and by PBS-1, sure. Contingent liabilities can be right before a breach of? Contingent liabilities under the survival statute have a five-year window in which you can sue under them if the cause of action accrues after disillusion. Absolutely. And that's what Evans says right at pages 112 to 113. So, you know, and they have also not asked you to overrule. I mean, you know, they've got ten more minutes. They haven't asked yet for you to overrule Evans, but they've just said that we're misinterpreting it. I don't see Evans as being at all unclear. I don't see this rule as being at all unclear. If I can turn to a couple of points that Mr. Kobachek raised. One, you would ask, Justice Thomas, just to be clear on the various facts. One other fact that I think is important and I think is a modification of a fact that he said, it is true that PBS-1, after it sold its limited partnership interest in national material, was an existing corporation. It is not true in the record. It's undisputed in the record that it was not a viable corporation. It immediately paid out all of its assets to its sole shareholder, Mr. Tang. So the idea that it was actually viable, you know, Mr. Kobachek is saying, well, PBS-1 retained that liability. We didn't pay $5.5 million to get that liability. Well, PBS-1 didn't retain the liability. They retained the liability, but they retained their liability with no assets. And that then dovetails into the point that what happened here and why this was a mere continuation is that you had the same shareholder, and it was actually a paper restructuring. It is not material to this Court's decision, but just in terms of clarification, there were several different grounds in the record that we had for why successor liability ought to apply. Mr. Kobachek said, you know, there was no dispute. I believe I heard him say there was no dispute that this was all for a legitimate business purpose. That actually was disputed. The trial court said there was a fact question on that, and so it went off on the other grounds that it was a mere continuation, and that they had actually assumed the contract. So I just don't want to suggest, however the Court decides to rule, that I'm somehow waiving that. The only other thing I'd like to say is, given how long the whiskers are on this litigation and the record that the Court has in front of it, and I would urge the Court to consider exercising its discretion, that we, the parties, have fully briefed the novation argument. I think that novation is actually fairly straightforward in this instance, and I think that it provides an alternative ground that if the Court is going to affirm the Second District and rule that this was a liability incurred, that it is appropriate, would be appropriate for the Court to reach the novation argument, because that would actually avoid a trial and potentially many more years of litigation. Is your position that there are no questions of material fact that exist? It is our position that there is no question of material fact, certainly, Justice Freeman, on the question of consent, because there has been no evidence that's been introduced. Issues like novation, assumption of the obligation, and success of cooperation, there are no facts? Oh, absolutely. Well, there are no material facts. I think that there are no material facts on any of those issues that would preclude summary judgment. And on novation specifically, I mean, on assumption, absolutely not. The contract provisions are clear that national material, what national material bought was national material bought PBS1's partnership interest. The idea that Mr. Kobachek is saying, well, we came in, we, being Mr. Tang, okay, signed in all of these different capacities. He came in, and what he did was he bought less from PBS1 than what PBS1 owned. It doesn't make any sense. It's not what the record supports. What it said was we're buying all of your limited partnership interest. And in that instance, the limited partnership interest that they bought was one in which they also assumed the consulting agreement. That's undisputed. In terms of novation, the key undisputed facts are that PBS1 assumed the contract after now, as they've clarified their position in their reply briefs, after they say the novation occurred, which doesn't make any sense. They assumed an obligation which they assumed from Pilot Corp. after they say that Mr. Pilot had novated in favor of Pilot LP. That path doesn't work. And it's their obligation to show, to at least come forward with evidence on summary judgment to create a tribal issue on their affirmative defense of novation. We can point to the absence of evidence. Thank you. Thank you for your argument. Your rebuttal is divided as well? Yes, Your Honor. Thank you. Five and five? Yes. Thank you. First, I would like to discuss the case that Mr. Lloyd relied on concerning the survival statute, the Evans case from 1921. And I think there's really a disconnect here about what happened in that case. And it's clearly distinguishable from this case and not at all inconsistent with our reading of the statute. And that's because in the Evans case, the receiver, when he was appointed as receiver for the corporation, contended that upon his appointment, business with the corporation had to effectively cease. The corporation had not dissolved. There was only a receiver. And the court said, no, these bonds, although they were not breached before you were appointed, they were breached before the corporation dissolved. And the key point in time is the dissolution of the corporation, not the appointment of a receiver. And, therefore, there was a claim existing before the corporation dissolved. The appointment of the receiver had no effect on whether the claims for breach of those bonds survived or not. And, moreover, the situation of a bond is clearly affixed in an ascertainable amount, unlike the situation that we have here. Mr. Lloyd said that Mrs. Pilot had a contingent right against PBS-1 and a contingent liability incurred and that our view is effectively caveat emptor. I'm not sure I would put it quite that way. But what I would say is the legislature has decided in the context of dissolving corporations on a balance between corporations and persons and entities with which the corporation deals. So this is not just a statute that balances the rights of creditors and corporations. But, as I indicated in my main argument, the statute also controls what claims can be brought and asserted by a corporation before dissolution. And so under our reading of the statute, we know that if you're going to be negotiating a long-term right with a corporation, that you've got to take into account the fact that it may go away. And right now the law provides certainty in terms of understanding what you have to do. Robert Pilot's counsel understood that when he left the company in 1988. And so his agreement was structured so as to preserve his rights under the statute. I do want to address briefly the novation argument that Mr. Lloyd raised. And that's because that was one of the affirmative defenses that PBS1 also asserted in the trial court and the appellate court. And as Justice Freeman's question suggests, in fact, I think their record is replete with disputed facts as to whether there was a novation here. And if anything, the appellate court was correct that there has to be a trial on that issue. Mr. Lloyd says there was no evidence of Arthur Pilot's consent to a novation, but indeed there was. Michael Zavis, who was an attorney representing Pilot, Inc., had a meeting with Arthur Pilot and James Pilot and Dorothy Pilot in which he explained the transaction that was about to take place in 1988. And according to Mr. Zavis' affidavit, Arthur Pilot agreed to substitute Pilot LP, the new entity, that was coming out of the restructuring for Pilot, Inc., and he was receiving a much stronger entity as an obligor under his consulting agreement. And now in the briefs, plaintiff points to Mr. Zavis' deposition, but there's really not a clear contradiction there because Mr. Zavis' affidavit speaks to what was said between him and Arthur Pilot and James Pilot in the meetings before the April 1988 restructuring transaction. In Mr. Zavis' deposition, he speaks of what his intention was, but he never contradicts what he said about what took place at these meetings. And as the appellate court pointed out, what Mr. Zavis said in his affidavit about what was said in those meetings was the language of novation. So at a minimum, there are clearly disputed facts as to that question. And Mr. Lloyd says that the argument that somehow there was a novation before PBS1 assumed the liabilities of Pilot, Inc. doesn't make any sense. Well, to me, that sounds like a fact argument, that sounds like an argument for the jury, but certainly not one here where the court would reverse the reasoning of the appellate court on that question. If the court has no other questions, I will conclude and again ask for judgment in PBS1's favor. Thank you. To address one of the issues that Mr. Lloyd raised is the question of the viability of PBS1. Essentially what he's asking you to say is that a corporation in good standing has to have a second assessment, whether or not it is in good standing. Is it viable to conduct business? And at all times, from 1991 through its dissolution in the middle of 1994, for three and a half years, it was a viable corporation in good standing, able to conduct any and all business permitted under statute. So yes, it was viable. He also raised the question about this just being a specific paper restructuring. Well, again, those are fact issues that need to be developed and dealt with at a court hearing, not on summary judgment as they have been. I would also address briefly the issue of novation as to the logic of how it was done. The novation occurred before the transaction. And then the transaction that took place was a transaction between PBS1 and Pilot Corp. No other parties. If you read the document, the asset purchase agreement carefully, the section in there provides that the document is not to be relied upon by any third parties. It was simply a document by how the two corporations were allocating assets and liabilities for their own purposes, not as it related to the rest of the world and certainly not as it related to Mr. Pilot. And then the question about what national material bought. What does 100 percent of this obligation mean? Again, I would assert that it can only mean what it means by statute and what it means pursuant to the limited partnership agreement. And if the court were to make the word obligation mean everything, it would throw into doubt hundreds if not thousands of limited partnership transfers that take place every day, every year for thousands of them throughout this state. Parties to these transactions need to know with certainty what's at stake. And if words of art, which I believe these were, say that it's 100 percent of an obligation based upon a partnership agreement, that's what it means and nothing more. I have no further comments. Thank you to all counsel for your arguments today. Case number 112064, Dorothy Pilot et al. versus James Pilot et al. is taken under advisement as agenda number eight.